The Fidelity Insurance Trust and Safe Deposit Company, Joseph F. Sinnott and Walton Pennewill, Executors and Trustees of Andrew M. Moore, deceased, Appellants, *v.* Albert H. Moore.

*Trusts and trustees—Resulting trust—Evidence—Equity—Parent and child.*

The evidence in support of a resulting trust in land in favor of a son whose father had taken title in his own name, but had permitted the son a certain dominion over the land, must be clear, precise, convincing and satisfactory. It is not enough that it satisfies a jury, it must also satisfy the mind and conscience of the court sitting as a chancellor reviewing the testimony; and if it fail in this respect it must be withdrawn from the jury.

Negotiations for the purchase of a farm were carried on by a son; the contract for the purchase of it was signed by him in his own name, but in the body of the contract it was recited that he executed it for his father. He paid the hand money on the contract, $5,000, with his own check, but he received his father's check on that day for that amount. The price of the farm was $26,000, and the balance of the purchase money was secured by the father's bond. The son bought the unexpired term of the tenant for a small consideration and entered into possession of the farm. The father expended over $700,000 in improvements contracted for by the son, payment of taxes, purchasing of blooded stock and various other matters on the farm. In the mean time he made declarations to strangers that he had bought the farm for the son, but took the title in his own name that he might keep " tab " on it. The son had no means of his own. The father was amply able and willing to pay. *Held*, that no trust resulted for the farm in favor of the son.

Argued Jan. 30, 1900.    Appeal, No. 426, Jan. T., 1899, by plaintiffs, from judgment of C. P. Montgomery Co., Oct. T., 1898, No. 30, on verdict for defendant.    Before GREEN, C. J., McCOLLUM, DEAN, FELL and MESTREZAT, JJ.    Reversed.

Ejectment for a tract of land in Colmar township.    Before WEAND, J.

The facts are fully stated in in the opinion of the Supreme Court.

The court refused to give binding instructions for the plaintiffs.

Verdict and judgment for defendant.    Plaintiffs appealed.

*Error assigned* among others was refusing to give binding instructions for plaintiffs.

*Montgomery Evans*, with him *Simpson & Brown*, for appelants.—The court should have directed the jury to find a verdict in favor of the plaintiffs: Todd v. Campbell, 32 Pa. 250 ; McGinity v. McGinity, 63 Pa. 38 ; Church v. Ruland, 64 Pa. 432 ; Faust v. Haas, 73 Pa. 295 ; Burger v. Dankel, 100 Pa. 113 ; Huoncker v. Merkey, 102 Pa. 462; Null v. Fries, 110 Pa. 521 ; Reno v. Moss, 120 Pa. 49 ; Hess v. Calender, 120 Pa. 138; Wylie v. Mansley, 132 Pa. 65; Saunders v. Gould, 134 Pa. 445; Silliman v. Haas, 151 Pa. 52; Gilchrist v. Brown, 165 Pa. 275; Sample v. Herlacher, 177 Pa. 247; Williams v. Milligan, 183 Pa. 386 ; Olinger v. Shultz, 183 Pa. 469 ; Kegerreis v. Lutz, 187 Pa. 252; Bowen v. Haupt, 192 Pa. 406.

Where a son goes into possession of his father's land and makes improvements, a jury is not to infer from that, in the absence of other evidence, that the father gave him the land ; neither are loose declarations of the father to his neighbors, in casual conversations, calling it his son's property, without any explanation how it came to be his, sufficient evidence of a gift. Still less are such things evidence of such a parol sale as a chancellor would have decreed the specific performance of : Hugus v. Walker, 12 Pa. 173 ; Moore v. Small, 19 Pa. 461 ; Rankin v. Simpson, 19 Pa. 471 ; Railroad v. Knowles, 117 Pa. 77 ; Shellhammer v. Ashbaugh, 83 Pa. 24.

The declarations of the father as to the son's ownership, made in the absence of the son, should have been excluded: Poorman v. Gilgore, 26 Pa. 365; Ackerman v. Fisher, 57 Pa. 457; Edwards v. Morgan, 100 Pa. 330; Moyer's App., 105 Pa. 432; Allison v. Burns, 107 Pa. 50; Burgess v. Burgess, 109 Pa. 312; McKowen v. McDonald, 43 Pa. 441.

*N. H. Larzelere*, with him *M. M. Gibson* and *G. R. Fox*, for appellee.—The disputed facts arising upon the testimony have been settled by the verdict adversely to appellant's contention and in favor of the appellee.

The facts undisputed and those established by the verdict have "satisfied the mind and conscience of the court sitting as chancellor," in accordance with the rule laid down in Olinger v. Shultz, 183 Pa. 474; Galbraith v. Galbraith, 190 Pa. 227.

But, if the facts alleged are sufficient, is satisfactorily established, yet the evidence in relation to them is conflicting, or the credibility of witnesses is involved, and the conflicting testimony is of such a character that he can conscionably sustain a verdict either way, as the jury may find, the case should go to the jury with careful instructions, to turn upon their finding of disputed facts: Light v. Zeller, 144 Pa. 604.

The declarations and confessions of the alleged trustee may be given in evidence: Gregory v. Setter, 1 Dall. 193; German v. Gabbald, 3 Binn. 302; Williard v. Williard, 56 Pa. 124.

OPINION BY MR. JUSTICE DEAN, February 12, 1900:

The plaintiffs brought ejectment against defendant for a farm of 189 acres at Colmar, Montgomery county. At the trial, they showed a complete legal title in defendant's father, their testator. Defendant claimed the equitable title under a trust resulting in his favor from payment by him of the purchase money. The evidence tending to establish the trust was submitted to the jury by the court below. The verdict was for defendant. The court having entered judgment on it, we have this appeal by plaintiffs, who allege, there was no evidence legally sufficient to establish a resulting trust, and therefore, the court erred in not directing a verdict for plaintiff.

It seems to us, if a rule of law, in its application to the more or less varying facts in this class of cases, can be said to be set-

tled, its application in this case must be undoubted, in view of the facts before us.   In the latest case, Olinger v. Shultz, 183 Pa. 474, the present Chief Justice says :—" The rule of law in this class of cases, as established by numerous decisions of this Court, is without any doubt or question.   The evidence in support of the trust, must be clear, precise, convincing and satisfactory, It is not enough that it satisfies a jury, it must also satisfy the mind and conscience of the court, sitting as a chancellor reviewing the testimony, and if it fails in this respect, it must be withdrawn from the jury."   He then cites quite a list of the later cases in this state, where the rule has been enforced, all of which, as well as those of much earlier date, amply vindicate his statement of the rule.   A reference to Olinger v. Shultz, supra, is all this case demands by way of authority.

Let us then review the facts proved in the court below, and see if they stand the test of this settled rule.   The negotiations for the purchase of the property were initiated and carried on by defendant, Albert H. Moore.   In what capacity, or for whom did he act?   For himself, or for his father?   The article of agreement is dated October 22, 1888, and was made with C. Todd Jenkins, the owner ; it purports to be made with the father, although signed by A. H. Moore, without the addition of the word agent to his signature ; but in the body of the agreement, he uses these words :— "A. H. Moore executes this agreement in behalf of his father, Andrew M. Moore."   The consideration for the farm is $26,000, to be paid, practically, $5,000, cash, and balance payable in one year, to be secured by mortgage. At the time of the contract, the farm was incumbered by three mortgages, amounting altogether to $12,800.   About ten days after the agreement, Jenkins met the father and made with him a settlement or adjustment of the purchase money : about this date, probably a day or two before, the son had given his check to Jenkins for $5,000 of the hand money.   The receipt given reads : " Recieved of Andrew M. Moore by the hands of A. H. Moore, his check to the order of C. Todd Jenkins for $5,000 on account of the purchase money for the farm in Montgomery township."   For the balance of the purchase money, the father settled, leaving due and unpaid to Jenkins, $8,200, for which sum he gave to Jenkins his personal bond secured by his mortgage on the farm, and took the deed in his own name.   The

son went into possession, and at once commenced making very expensive improvements to render the farm suitable to horse breeding purposes. He did breed and rear upon it, blooded horses. The project, evidently, was not a financial success; the son had no means of his own: from the date of the purchase until his death on January 26, 1898, the father paid bills incurred for improvements on the farm, and for stock and other expenses, the sum of $741,000. He also paid the taxes from year to year, and his executors continued to pay them after his death. The plaintiff's evidence, showed in them, both a complete legal and equitable estate; so far as we have stated them, not a single essential fact is wanting to make out their right to possession. But, defendant alleges, that a trust in the land results in his favor, because :—1. All the bargaining for the property was done by him. 2. All the cash paid at the date of the contract, when the father took the conveyance in his own name, was paid by him, the son. 3. The buying out of the tenant then in possession, and payment of money to him, were by the son. 4. He went into possession as owner, made such improvements as he chose, and in every particular, treated the property as his own. 5. All the buildings were insured in the son's name. 6. All the contracts were made by the son, and paid for by him. 7. He never rendered any account to his father, nor did the father regard him as a tenant. 8. The father declared to third parties, that he held title in trust for his son.

Before considering the facts averred in this statement, the first inquiry that suggests itself to the mind, is, what were the relations of the parties? For if they were merely landlord and tenant at will, the conduct of the landlord is absurdly inconsistent with such a purely business relation. That a man will pay $26,000 for a farm, put a tenant upon it, permit the tenant for ten years to enjoy all its benefits without once asking him to account, and besides, pay him over $700,000 for staying there, is a stretch of generosity on the part of the landlord, that at once prompts us to look for some other relation than one merely of business. The landlord in this case was the father of the tenant, besides, had an estate running into millions; he could afford to, and did bestow his money as well as his affection upon his son. When we notice, that the parental relation existed, it is no more remarkable that he should spend his money that his son

might indulge his tastes, or even his whims, during his lifetime, than that he should give to him by will hundreds of thousands of dollars, to be enjoyed only after his death. So that, assuming the existence of some of the facts relied on by appellee, the significance of the inference to be drawn from them is of but little weight, in view of the real relation of the parties. But, first, it is argued, all the negotiations resulting in the sale of the farm were carried on by the son. Concede this; it is not inconsistent with the fact of the father's legal ownership. Subsequent events showed clearly the father did not want to live upon it, nor did he expect a revenue for himself; he wanted it for his son, who did want to live upon it, and breed horses; the father was not a horse breeder; his tastes lay wholly in a different direction, the mercantile business, in which he had accumulated his fortune. What more natural than that he should authorize the son to conduct the negotiation for the farm as well as select it? This exercise of such authority in no way negatived the father's ownership. But, second, it is alleged, the son paid the $5,000 hand money. Assume, for the moment, this to have been his own money; it was paid after the execution of the article in which he expressly sets out that he was acting as agent for his father; the presumption is that it was paid as agent, and if his own money, to that extent his father became his debtor. It is not the case of the agent paying the money of his principal and taking the deed in his own name, which at once creates a resulting trust in favor of the principal, but, that of the agent paying $5,000 for his principal, and then, by his, the agent's direction, the grantor makes the deed to the proper party, the principal, which, in effect only creates an indebtedness of the principal to the agent in that amount. But to go further, is the fact as alleged? Two days before the son's check for $5,000 was given, the father gave the son his check for $5,000, which the latter deposited to his own credit in the Keystone National Bank; on the same bank, the son drew his check in favor of Jenkins; then in the receipt of Jenkins to the son, it is stated, in substance the money is paid for the father. In view of the previous, as well as the subsequent conduct of the parties, and that the son was without means, while the father was amply able, as well as willing to pay, it is difficult for the mind to come to any other conclusion than that, practically,

this $5,000 came from the same pocket from which was paid the balance of the purchase money. We are of the opinion, that if the son paid the $5,000 out of his own money, he paid it as agent for his father; further, that the only reasonable inference from the evidence, is, that he paid it with money furnished by his father. As to the bargaining with the tenant in possession, and payment of the comparatively small sum for the surrender of his unexpired term, such conduct was entirely consistent with the relation of agent for his father. Who else would naturally attend to such business? Certainly, the aged father would not be expected to leave his home and business in the city and go to this farm in the winter to dicker with a tenant for a small fraction of an unexpired lease. That the son went into possession, made most costly contracts for improvements, probably improvident ones, for all of which the father paid, are facts of no significance as establishing a trust in the father when the parental relation is considered. The extent to which the son would act as owner, under such circumstances, would not be measured by a supposed littleness of the father's title, but by the largeness of a father's generosity. Then, as to the father's declaration to third parties, that he held the title in trust for his son, they are without weight. There was no payment of the purchase money by the son; consequently, no oral declarations of the father could, of themselves, create a resulting trust; if a trust in land could thereby result, we might as well wipe the statute of frauds from our list of laws.

We have no doubt this father bought this property with his own money, and took in his own name the legal title, intending that the son should live upon and enjoy it; and, doubtless, further intended, that at some future day, if the son's management and conduct met his approval, to either convey it to him in his lifetime, or devise it to him by will; and that he more than once disclosed this intention in his own rugged speech, to third persons; and that is all his declarations amount to. Take the first one, as testified to by Mr. Jenkins, made to him, when the deed and mortgage were being prepared in his own name, thus : "I remarked to him that I thought this property was his son's, and he said, well, he bought it for his son, but he wanted to have it in this way to keep an eye upon it or keep tab." He could not, more clearly, have announced his intention to hold

on to the title to his own property, bought for his son, until such time as suited him to transfer it to the son.   Whether he abandoned this, at that time fully formed intention, because of disappointment in the son's management, or whether that intention was thwarted by death, we do not know.   We do know, that he did nothing thereafter, which, in law or equity, would divest his title.   Therefore, the learned judge should have instructed the jury to find for plaintiffs because of the utter insufficiency of defendant's evidence to establish an equitable estate in the land.   The lucid charge of the learned judge leans very strongly in favor of plaintiffs; any one reading it, must, we think, be impressed by the thought, that he doubted whether the plea of defendant was sustained by the evidence.   Under such circumstances, he should not have left the issue to be determined by twelve unlearned chancellors in the box, but should have, himself, assumed the responsibility of deciding it.

The judgment is reversed.

PER CURIAM:

And now March 5, 1900, on consideration of foregoing opinion, it is ordered that judgment be entered for plaintiffs for land described in writ of ejectment.